UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
DAVID MICHAELS,                                          :

               Plaintiff,                          :          12 Civ. 9213 (RJS) (GWG)

   -v.-                                                  :          REPORT AND
                                          RECOMMENDATION
CAROLYN W. COLVIN,                                      :
Acting Commissioner of Social Security,
                                   :

               Defendant.
-----------------------------------------------------------------X
GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE

      Plaintiff David Michaels brings this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of the final decision of the Commissioner of Social Security ("Commissioner")

denying his claims for Disability Insurance Benefits under the Social Security Act.  The

Commissioner and Michaels have each moved for judgment on the pleadings pursuant to Rule

12(c) of the Federal Rules of Civil Procedure.  For the reasons stated below, Michaels' motion

should be denied, and the Commissioner's motion should be granted.

I.      BACKGROUND

     A.    Michaels' Claim for Benefits and Procedural History

      Michaels filed the instant application for disability benefits on June 14, 2007, alleging

that he became disabled on December 8, 2003.  Administrative Record, filed Apr. 22, 2013

(Docket # 6) ("R"), 15.  He was insured for benefits through December 31, 2007.  R. 18.  He was

born on May 5, 1953, R. 219, and has most recently worked as a comptroller, R. 25.

      On September 5, 2007, the Commissioner denied Michaels' application for disability

benefits.  R. 137-45.  Michaels then requested a hearing before an administrative law judge

("ALJ").  R. 116.  A hearing before an ALJ was held in the matter on June 15, 2009.  R. 93-111.

1

On July 6, 2009, the ALJ issued a decision finding that Michaels was not disabled.  R. 116-22.

Michaels then appealed the ALJ's ruling to the Appeals Council, R. 173, which granted the

request for review and remanded the case for resolution of certain issues, R. 127-30.  A second

hearing was held before the ALJ on August 3, 2011.  R. 32-73.  On September 15, 2011, the ALJ

issued a decision finding that Michaels was not disabled.  R. 15-26.  Michaels once again

appealed the ALJ's ruling to the Appeals Council, R. 9, but his request for review was denied on

October 31, 2012, R. 1-3.

On December 18, 2012, Michaels filed the instant lawsuit seeking review of the ALJ's

decision under 42 U.S.C. § 405(g).  See Complaint, filed Dec. 18, 2012 (Docket # 1).  Michaels

and the Commissioner have cross-moved for judgment on the pleadings pursuant to Rule 12(c)

of the Federal Rules of Civil Procedure.[1]

B.      The Administrative Record Before the ALJ

1.      Treating Source Records

The earliest treatment records pertaining to Michaels' alleged disability are his inpatient

care records from Putnam Hospital Center.  R. 672-732.  On December 8, 2003, Michaels was

brought to the hospital after he "fell from a flight of stairs sustaining a large scalp laceration,

with voluminous blood loss, as well as a concussion."  R. 673.  The treating physician assessed

that Michaels had "a traumatic injury to the head secondary to a fall with significant blood loss

and a cerebral percussion" and concluded that Michaels should "be admitted for intravenous

---

[1] See Notice of Motion for Judgment on the Pleadings, filed June 5, 2013 (Docket # 10); Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, filed June 5, 2013 (Docket # 11) ("Pl. Mem."); Notice of Cross-Motion, filed Nov. 13, 2013 (Docket # 16); Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings, filed Nov. 13, 2013 (Docket # 17); Plaintiff's Reply Memorandum, filed Nov. 27, 2013 (Docket # 18) ("Pl. Reply").

fluids and neurological observation." R. 679-80.  While in the emergency room, Michaels underwent a chest x-ray, a C-spine plain film, a thoracic spine plain film, and a CT scan of the head.  R. 699.  These and other tests revealed that Michaels had suffered a dislocation with avulsion fragment of the left middle finger, R. 701; a compression fracture of the upper thoracic spine, id.; subsegmental atelectasis of the lower lobes of both lungs, R. 715; and multilevel degenerative cervical spondylosis, R. 718.  The CT scan of Michaels' head found that, although there was a severe laceration, there was "no evidence of cerebral hemorrhage, mass effect or territorial infarct."  R. 721.  To treat these injuries, Michaels was placed in a brace, given physical therapy, and referred for orthopedic management.  R. 673.  Michaels was discharged from Putnam Hospital Center on December 15, 2003.  Id.

On December 19, 2003, orthopedic surgeon Stuart Elkowitz, M.D., examined Michaels' left middle finger, finding that although there was a small articular fracture, there was no deviation in the radial or ulnar planes, no rotational deformity, and a good range of motion. R. 652-53.  Dr. Elkowitz recommended a non-operative course of treatment, giving Michaels a dorsal blocking splint for the finger and starting him on early range of motion exercises.  R. 653. In a follow-up visit on January 2, 2004, Dr. Elkowitz observed that the swelling of the finger had improved and that there was still no rotational deformity.  R. 665.  During an appointment on March 8, 2004, Dr. Elkowitz commented that he was "very pleased" with the progress of Michaels' finger, R. 661, and on April 12, 2004, stated that Michaels had "made great strives [sic] in terms of improving his range of motion," R. 658.  However, during the April 12, 2004 visit, Dr. Elkowitz noted that Michaels now complained of "some pain in multiple PIP joints" and recommended that Michaels consult a rheumatologist.  Id.

Michaels also received treatment for his cervical spine injuries following the accident.

3

On December 18, 2013, orthopedic surgeon Andrew Peretz, M.D., referred Michaels for an MRI examination of his cervical spine which found that Michaels suffered from "multilevel moderate diffuse disc bulging" and "neural foraminal stenosis." R. 651.  Dr. Peretz examined Michaels on January 6, 2004, and noted that his "thoracic spine [was] not really symptomatic" and that Michaels had "no significant pain." R. 664.  On February 24, 2004, Dr. Peretz assessed that there was "partial healing of the laminar [cervical] fracture" and that "[t]he pain is better except when he sneezes." R. 662.  From this, Dr. Peretz recommended that Michaels begin a new physical therapy schedule.  Id.  On May 20, 2004, Dr. Peretz ordered a CT scan of Michaels' cervical spine which found that the laminar fracture was now "only faintly visible," constituting "[e]vidence of continued healing." R. 650.  Finally, Dr. Peretz assessed on June 1, 2004, that "therapy has helped [the spinal injury] and overall he is much better except for feeling of stiffness." R. 657.  Dr. Peretz noted that Michaels now had "full range of motion of his neck without pain" and that he had "essentially a healed fracture of the lamina."  Id.

Since the accident, Michaels has been examined by primary care physician, Glenn Legler, M.D., at Northern Medical Specialists.  Michaels went to Northern Medical Specialists on December 18, 2003, to have the stitches for his head laceration removed. R. 519.  The medical record from that day notes that Michaels was "[d]oing well status post fall" and that he "ha[d] good range of motion and [a] normal neurovascular exam."  Id.  Dr. Legler examined Michaels on January 9, 2004, noting that Michaels had "been experiencing some positional vertigo"[2] and "complain[ed] of some general fatigue due to significant blood loss." R. 515.  Dr. Legler recommended that Michaels receive a neurological consultation.  Id.

---

[2] Positional vertigo is "[a] sensation of spinning or whirling motion" that "occur[s] with a change in body position." Stedman's Medical Dictionary 1958 (27th ed. 2000) ("Stedman").

4

On February 10, 2004, neurologist Kishore Ranade, M.D., performed a neurological examination of Michaels.  R. 513-14.  Dr. Ranade explained in his report of the examination that Michaels had a "brief loss of consciousness" following his fall but "did not have any brain hemorrhage because initial CT of the head was negative."  R. 513.  Dr. Ranade noted Michaels' complaints that "[i]nitially, he had vertigo when he moved his head, but now he gets disequilibrium and slight dizziness when he suddenly bends his head."  Id.  Furthermore, Michaels complained that he became "mentally fatigued easily" and became "somewhat dizzy and nauseous when he is sitting in a car" but denied having "any troubles with memory, task initiation, or multitasking."  Id.  After examining Michaels, Dr. Ranade assessed that Michaels' "[m]ental status [was] normal," that "no nystagmus[3] was visible," that "[m]otor exam [was] normal," "[s]ensory exam [was] normal," and "[c]erebellar function and gait [were] normal."  Id.  From this, Dr. Ranade concluded that Michaels had suffered from posttraumatic vertigo.  Id.  To treat the condition, Dr. Ranade recommended that Michaels perform daily exercises but did not believe that any pharmacological treatment was needed.  R. 514.  Dr. Ranade also referred Michaels to undergo vestibular therapy[4] to treat his vertigo.  R. 361-64.

Beginning in August 2004 and continuing until at least 2008, Michaels regularly

---

[3] Nystagmus is "[i]nvoluntary rhythmic oscillation of the eyeballs, either pendular or with a slow and fast component."  Stedman at 1246.

[4] According to the Vestibular Disorders Association, vestibular rehabilitation therapy ("VRT") "is an exercise-based program designed to promote central nervous system compensation for inner ear deficits . . . . The goal of VRT is to retrain the brain to recognize and process signals from the vestibular system in coordination with vision and proprioception.  This often involves desensitizing the balance system to movements that provoke symptoms."  Vestibular Rehabilitation Therapy (VRT), Vestibular Disorder Association (Feb. 5, 2014), http://vestibular.org/understanding-vestibular-disorder/treatment/treatment-detail-page.

underwent vestibular therapy with physical therapist Patricia Larkin.  R. 366-449.  During his

first session with Larkin on August 17, 2004, Michaels reported that he would usually sleep

seven hours at night and then take a two-hour nap during the day.  R. 366.  He complained that

he sometimes felt dizzy or nauseous, with worsening conditions when he was in narrow spaces

like a grocery store aisle or when he watched car chase scenes on the television.  Id.  Michaels

stated that he was usually able to sit at a computer for about two hours at a time.  Id.

Additionally, Michaels noted that he had fatigue with some activities of daily living and could

not work but that he was able to help out with the "Temple Times" publication for his

synagogue.  R. 367.  Michaels mentioned that he was planning to take a trip to Lake George

where he would rent a motorboat.  Id.  After examining Michaels, Larkin concluded that his

range of motion was "moderately stiff," that his strength and endurance were "deconditioned,"[5]

that his balance and gait "varie[d]," and that his posture was good.  Id.  Larkin assessed that

Michaels had vestibular dysfunction with a "good" prognosis and assigned Michaels to a

treatment plan with therapeutic exercises to improve his strength and endurance and

"neuromuscular reeducation" to improve his balance.  Id.

In a subsequent vestibular therapy appointment on September 7, 2004, Michaels reported

that he had "some bad days . . . depend[ing] on what [he's] doing" and that he had a two to two-

and-a-half hour limit on his ability to use a computer.  R. 394.  On September 21, 2004, he

reported that he had tried working at his computer for two hours twice in one day but that he

needed to take breaks to close his eyes and let his "system calm down."  R. 393.  On September

---

[5] "Deconditioning" has been defined as a "loss of physical fitness due to failure to maintain an optimal level of physical activity or training."  Holifield v. UNUM Life Ins. Co. of Am., 640 F. Supp. 2d 1224, 1230 n.4 (C.D. Cal. 2009) (citation and internal quotation marks omitted).

28, 2004, he reported having a bad day after mowing the lawn and working on the computer for too long.  Id.  On October 4, 2004, Michaels once again complained of having worse symptoms after working on the computer for two hours.  R. 392.  Michaels also stated that he was exercising by going on walks for about twenty minutes and using a "stepper" machine.  Id.  During appointments from October 12, 2004, to November 30, 2004, Michaels similarly complained that he had more severe symptoms after performing physical activities such as stacking wood, going grocery shopping, walking up stairs, and driving.  R. 392-93.

In January 2005, Michaels complained of having "bad days" in which he felt nauseous after working at his computer for two or more hours at a time.  R. 391.  However, at an appointment on February 11, 2005, Michaels reported some improvement in being able to work at the computer for longer periods of time and not feeling as ill afterwards.  R. 390.  On February 17, 2005, Larkin reevaluated Michaels' condition, finding that he had neck stiffness and "headaches after several hours of reading or working at computer."  R. 460.  Larkin reported that Michaels performed various physical activities such as carrying logs for his heating and doing vestibular exercises for 15 minutes a day.  Id.  Larkin assessed that Michaels should continue with his treatment plan and gave Michaels an "excellent" prognosis for improving his condition.  R. 461.

Throughout 2005 and 2006, Michaels continued to receive vestibular therapy at Katonah Physical Therapy, during which he reported varying levels of symptoms.  For example, in an appointment on March 11, 2005, he stated that he had to stop using a computer after only 90 minutes, R. 390; but on March 29, 2005, he said that he could work on a computer for up to 3.5 hours, depending on what he was doing, R. 389.  At times, Michaels complained of having different issues relating to his condition, such as "severe headaches," R. 466, "dysequilibrium to

7

lateral head movements," R. 444, exhaustion, R. 388, and dizziness, R. 467.  On the other hand,

Michaels remained relatively active, engaging in activities such as driving, R. 389; attending

social functions, R. 388; stacking wood and doing other yardwork and household chores, R. 387;

and bicycling, R. 385.  Michaels also reported that he regularly exercised, although he often had

to rest afterwards.  See, e.g., R. 383 ("In past week, walked outside 3 times, 10, 12, + 18

minutes."); R. 449 (stating that Michaels regularly went on walks for 15-20 minutes and used the

"stepper" machine for 8 minutes).  On May 18, 2006, Michaels reported that he was hearing a

ringing noise in his ears for the past ten days and that he was scheduled to have an Auditory

Brainstem Recording (ABR).  R. 382.

In 2007, Michaels reported similar levels of activity and symptoms.  On May 9, 2007, he

stated that he felt nauseous and had to lie down after three hours of "scrolling" on the computer.

R. 376.  On May 17, 2007, Michaels completed a "dizziness inventory" questionnaire in which

he reported that walking down supermarket aisles increased his dizziness, quick head

movements made him dizzy, and that the following activities "sometimes" made him dizzy:

looking up, walking down a sidewalk, and bending over.  R. 395-96.  He further indicated on the

form that these problems affected his life in the following ways: they interfered with his job and

household responsibilities, made it difficult for him to concentrate, made it difficult for him to

do strenuous yardwork, made it difficult for him engage in sporting activities, and made it

difficult for him to read, and "sometimes" placed stress on his personal relationships, affected

his ability to partake in social activities, restricted his ability to travel, and made him feel

depressed.  Id.  However, Michaels reported that these issues did not affect his ability to get out

of bed, to leave his home on his own, to go on a walk alone, to walk around his house in the

dark, or to stay home alone.  Id.  Based on these answers, he received a "dizziness handicap"

score of 54 on a scale of 0 (indicating "no perceived disability") to 100 (indicating "maximum perceived disability").  R. 397.

Michaels' dizziness condition was last evaluated at Katonah Physical Therapy on July 15, 2008.  R. 782.  On that date, Larkin assessed that Michaels' dizziness was normally 0 on a scale from 0 to 5, but "at worst," it was a 3.  Id.  Furthermore, Michaels continued to have neck pain and "deconditioned" strength and endurance.  Id.  However, Larkin found that Michaels was "independent with modifications" and that his activity level had improved in that Michaels was now able to attend board meetings at his synagogue.  Id.  Larkin also noted that Michaels' fall risk had improved from high to moderate.  Id.  Larkin recommended that Michaels continue to receive therapy once a week for up to three months and that he continue to do therapeutic exercises.  Id.

Since January 16, 2007, Michaels has also regularly received treatment (once every three months) from otolaryngologist Lawrence Z. Meiteles, M.D.  R. 568.  At his initial assessment of Michaels, Dr. Meiteles reported that Michaels' "symptoms have improved with vestibular therapy to a chronic imbalance with associated nausea" and that "[h]is last bout of vomiting associated with the dizziness was approximately four months ago."  R. 578.  Additionally, Michaels' "symptoms [were] motion provoked" and "[w]orking on the computer screen exacerbate[d] his symptoms."  Id.  Michaels also complained to Dr. Meiteles of "bilateral tinnitus[6] as for the past six months."  Id.  Dr. Meiteles' physical examination of Michaels revealed that Michaels' "tympanic membrane was intact and clear bilaterally," that he had "mildly enlarged turbinates on nasal examination," that "[t]he remainder of the head and neck

---

[6] Tinnitus is "[n]oises (ringing, whistling, hissing, roaring, booming, etc.) in the ears." Stedman at 1838.

examination was normal," that "[c]ranial nerve and cerebellar function [were] normal," that "[o]n the Romberg test[7] there was a sway reaction using a hip strategy," that "[o]n the Fukuda stepping test he maintained a straight direction, but there was excessive movement from side to side," and that "[t]here was no nystagmus on the Hallpike maneuver."[8]  Id.  From this, Dr. Meiteles concluded that Michaels had "high frequency sensorineural hearing loss" and "dysequilibrium[9] following trauma."  Id.

At the recommendation of Dr. Meiteles, on January 24, 2007, Michaels underwent Basic Balance Function Testing administered by Northern Westchester Hospital Balance Center Supervisor Shelley Hirsch, MA, CCC-A.  R. 355.  Hirsch noted that Michaels had reported bilateral tinnitus and that his audiogram had revealed bilateral high frequency sensorineural hearing loss.  Id.  After conducting an electronystagmography exam, Hirsch assessed that Michaels' "Basic Balance Function test results are consistent with a horizontal bilateral Benign Paroxysmal Positional nystagmus[10] worse on the right side evidenced by the horizontal

---

[7] Romberg Test is described as "with feet approximated, the subject stands with eyes open and then closed; if closing the eyes increases the unsteadiness, a loss of proprioceptive control is indicated, and the sign is positive."  Stedman at 1640.

[8] The Hallpike maneuver is a "test for eliciting paroxysmal vertigo and nystagmus in which the patient is brought from the sitting to the supine position with the head hanging over the examining table and turned to the right or left; vertigo and nystagmus are elicited when the head is rotated toward the affected ear."  Stedman at 1060.

[9] Disequilibrium is "[a] disturbance or absence of" the condition of "being evenly balanced."  Stedman at 522, 612.

[10] Benign paroxysmal positional vertigo ("BPPV") is a "disorder of the inner ear's vestibular system" that "produces a sensation of spinning called vertigo that is both paroxysmal and positional, meaning that it occurs suddenly and with a change in head position."  Benign Paroxysmal Positional Vertigo (BPPV), Vestibular Disorder Association (Feb. 5, 2014), http://vestibular.org/understanding-vestibular-disorders/types-vestibular-disorders/benign-paroxysmal-positional-vertigo.  "[S]ymptoms of BPPV include dizziness (lightheadedness),

nystagmus recorded on Hallpike Head Right and Head Left maneuvers, the Roll maneuver and ageotropic positional nystagmus." R. 356. Additionally, Michaels' "[b]ithermal responses to air caloric stimulation [were] judged to be symmetric" and his "[c]alibration and ocular-motor tasks [were] within normal limits." Id. Based on these results, Hirsch recommended that Michaels return to Dr. Meiteles for a follow-up and to continue his vestibular therapy. Id.

On May 21, 2007, Dr. Meiteles filled out a "vestibular disorder medical assessment form" for the Social Security Administration in which he diagnosed Michaels with "dysequilibrium." R. 568-72. Dr. Meiteles reported that Michaels had a history of frequent attacks of balance disturbances as well as tinnitus but that Michaels did not have progressive hearing loss. R. 568. Dr. Meiteles checked off boxes indicating that Michaels' symptoms included dizziness and nausea/vomiting, but he did not check off boxes for vertigo, malaise, visual disturbances, photosensitivity, mood changes, sensitivity to noise, fatigue/exhaustion, and mental confusion/inability to concentrate. Id. On the form, Dr. Meiteles indicated Michaels' dizziness attacks were "daily" and could last "hours." Id. He further reported that Michaels was most likely to become dizzy when walking, looking up, bending forward at the waist, or turning his head left and right and that these attacks could cause fatigue. R. 570.

Dr. Meiteles provided an update of Michaels' condition on May 28, 2009, stating that Michaels continued to complain of "constant tinnitus," "chronic imbalance sensation," and "associated mild nausea with his dysequilibrium symptoms" but that "[h]is symptoms have improved with vestibular therapy to a chronic imbalance with associated nausea." R. 797.

---

imbalance, difficulty concentrating, and nausea. Activities that bring on symptoms can vary in each person, but symptoms are precipitated by changing the head's position with respect to gravity." Id.

Additionally, Dr. Meiteles reported that Michaels' condition caused him to have "difficulty reading" and that "[using] a computer can trigger his symptoms." Id. Based on an evaluation of Michaels on January 15, 2009, Dr. Meiteles assessed that Michaels was "making slow progress" and that Michaels was "perform[ing] a walking exercise three times a week, walking one mile each time." Id. Dr. Meiteles added, "I have encouraged him to stay active, and to continue performing his balance exercises." Id.

2.    New York State Disability Claim Function Report

On July 23, 2007, Michaels submitted a "function report" to the New York State Office of Temporary and Disability Assistance, Division of Disability Determinations. R. 282-292. Michaels reported that, on a daily basis, from 7:30 to 9:00 he helped his daughter get ready for school and walked her to the school bus, from 9:00 to 11:00 he performed computer work for his synagogue and paid bills, from 11:00 to 2:00 he napped or watched television, from 2:00 to 3:30 he took a walk or went shopping, from 3:30 to 4:00 he relaxed, at 4:00 he "heat[ed] up" dinner, at 6:00 he helped his children with their homework, and then he watched television until he went to bed at 10:00 or 11:00. R. 283.

Michaels stated that he did not take care of any children or pets but mentioned that he did "help [his] kids with their homework until [his] wife return[ed] from work." Id. Before his injury, Michaels "[w]orked a full time job sitting in front of a computer for up to 10 hours a day" and was able to look at his computer, hold meetings with employees, and read for prolonged periods of time without feeling dizzy or tired. Id. Michaels reported that the injury was not affecting his sleep, except that he slept more than he used to and could not usually stay awake later than 11:00. Id. Michaels reported that his injury did not affect his ability to care for himself and that he did not need any reminders to take care of himself or to take his medication.

12

R. 283-84.  Michaels explained that he was capable of preparing food for himself on a daily

basis but that "[m]ost food preparation [was] done by [his] wife."  R. 284.  Michaels stated that

he was still able to perform indoor and outdoor household chores such as vacuuming, cleaning

sinks and toilets, and replenishing supplies in the bathroom and kitchen.  R. 285.  However,

"[m]owing the lawn gets [him] dizzy," and "[he] can't do heavy vacuuming of the house or

cleaning which involve back and forth motions or repetitively bending up and down, as [he]

get[s] dizzy and nauseous easily."  Id.

Michaels stated that he went outside on a daily basis and that he usually traveled by foot

or by car but that he could only drive "for short periods due to fatigue."  Id.  Additionally, he

went grocery shopping two to three times per week but could not shop for more than a half hour

"because walking down the aisles is disorienting making [him] dizzy."  R. 286.  Michaels

reported that he still managed his own finances and was able to pay his bills, handle a savings

account, and use a checkbook.  Id.  For entertainment, Michaels watched television and did

crossword puzzles but he could only work on the puzzle for "a half hour before getting fatigued

and dizzy."  Id.

Michaels reported that his injury did not make it difficult for him to get along with his

friends, family, or neighbors but that it did cause him to be less socially active because "[i]t's

difficult carrying on conversations, particularly with more than one person at a time — it

requires much more head/eye movement than talking to a single person."  R. 287.  Furthermore,

he reported that he attended religious services less frequently than before the accident because he

became "easily fatigued" and because "looking around a roomful of people is disorienting."  Id.

However, Michaels stayed active as a member of his synagogue's Board of Directors, attending

monthly board meetings and helping out "from time to time in the temple office [putting]

13

together the ads for the bi-monthly newsletter." Id.

Michaels complained that his injury affected his ability to walk, talk, and see because "[a]ny activity requiring eye and head movement lead [sic] to fatigue, dizziness and/or nausea." Id. Nevertheless, Michaels reported that he regularly walked one mile as part of his physical therapy and that he could walk "15 minutes or more" before he had to take a break. R. 288. Although Michaels indicated that his injury affected his ability to concentrate, he reported that he was still able to finish tasks and to follow spoken and written instructions. Id. Furthermore, his injury did not affect his ability to remember things. R. 289. Michaels then summarized how his injury has impacted his life, writing, "[b]efore my accident I was fully functioning and able to work a ful time job. Now, my vestibular issues with its dizziness, nausea and fatigue that can come upon me in any stressful situation or when I move my head up or down or side to side have severely limited my ability to do most things or have confidence in my ability to do or complete anything in a timely manner." Id.

Michaels also described the level of pain that he was feeling. He reported that he had stiffness of the neck, decreased range of motion, and that it was painful "to turn far to either direction." R. 290. Michaels stated that his physical therapy sessions had improved the pain and his range of motion somewhat but that his condition was "still not back to normal." R. 291. Michaels reported that he felt the pain daily whenever he turned his head to either side all the way. Id. He took medication for the pain, including motrin and ibuprofen, but they only slightly improved the stiffness and did not fully relieve the pain. Id. Michaels also performed exercises to treat the pain and to increase his range of motion. R. 292.

3.   Physical Residual Functional Capacity Assessment/M. Ray

On September 5, 2007, M. Ray, a non-physician state agency review analyst, evaluated

14

Michaels' medical record.  R. 736-41.  Ray first summarized the medical evidence, including the medical records provided by Dr. Elkowitz, Dr. Meiteles, and Dr. Peretz, and assigned Michaels a primary diagnosis of "horizontal benign positional vertigo" and a secondary diagnosis of "cervical spine degenerative disc disease."  R. 736.  Ray found that, despite having these medical conditions, Michaels had few exertional limitations.  R. 737.  Specifically, Ray determined that Michaels would be able to "[o]ccasionally lift and/or carry" up to 20 pounds, "[f]requently lift and/or carry" up to 10 pounds, "[s]tand and/or walk (with normal breaks)" for a total of "about 6 hours in an 8 hour workday," "[s]it (with normal breaks) for a total of "about 6 hours in an 8 hour workday," and "[p]ush and/or pull . . . unlimited, other than as shown for lift and/or carry." Id.  Ray assessed that Michaels would be able to frequently climb, stoop, kneel, crouch, and crawl, but Michaels would only occasionally be able to balance and that he "is limited to avoid balancing."  R. 738.  Ray also found that Michaels had no manipulative, visual, or communicative limitations.  R. 738-39.  Additionally, Michaels had no environmental limitations except he was "limited to avoid heights and hazards due to episodic vertigo."  R. 739.

Ray assessed Michaels' complaints that "any activity requiring eye and head movement leads to fatigue dizziness and nausea" to be only "partially credible" considering that Michaels had "reported improvement in his complaint of dizziness at 5/21/07 appointment with Dr [sic] Meiteles and at 7/5/07 general physical, claimant made no mention of balance disturbance." R. 739-40.  Additionally, Michaels' admissions that "he helps daughter get ready for school, takes daughter to school bus, does computer work for temple and or pays bills for two hours per day, shops and goes for walks daily . . . prepares simple meals, vacuums, cleans sinks, mirrors and toilet, fills soap and supplies in bathrooms and kitchen, drives, shops for groceries and watches TV" belied the purported severity of his condition.  R. 740.  Ray acknowledged that

15

some of his findings were "significantly different" from Dr. Meiteles' conclusions in the vestibular disorder medical assessment form.  Id.  However, Ray explained this discrepancy by noting that Dr. Meiteles did not "provide [any] specific physical limitations [or] respond to request for additional information regarding [Michaels'] limitations."  Id.

Ray's conclusions in the Functional Capacity Assessment appear to be based, in part, on the recommendation of an internist — identified as "A. Auerbach" — in an "Electronic Request for Medical Advice" form.  R. 734-35.  Dr. Auerbach relied on the results of Michaels' balance evaluation together with a May 21, 2007 entry in Michaels' medical record stating that "still with dizziness, patient feels 25% improved — no vertigo same last visit" to find that "[t]he available medical evidence fails to demonstrate frequent attacks of balance disturbance."  R. 734.  Dr. Auerbach recommended that "the claimant should avoid balancing, heights and hazards."  Id.

C.    The June 15, 2009 ALJ Hearing

Michaels testified at a hearing before the ALJ on June 15, 2009.  R. 74-111.  He was represented by attorney David Kuznicki.  R. 76.

Michaels testified that he has not worked at all since December 8, 2003.  R. 77.  On that date, Michaels fell from a temporary staircase in his house and suffered two fractures in his back, one fracture in his neck, and a concussion.  R. 77-78.  Prior to the accident, Michaels was "between jobs" and had most recently worked as the manager of a software development team at MCI WorldCom.  R. 78.  When asked by the ALJ what prevented him from working following the accident, Michaels replied, "I still have vestibular issues.  When I work on a computer, looking up and down from the desk to the screen, or even scrolling through the screens, without looking up and down, brings on dizziness.  Not so much dizziness anymore as lightheadedness

16

and fatigue." R. 79.  When questioned about what specifically bothered him when he used a computer, Michaels responded, "if I were looking at a static screen, that's not, that's not too terrible, but if you scroll through screens, you know, scrolling the screen up or even just switching screens back and forth, that seems to bring it on." Id.  Michaels further explained that, because the problem was with his eye and head movement, that "[reading] newspaper[s] is not, not too terrible [because] [t]he fact that the columns are narrower makes it a little bit easier." R. 80.

Michaels next testified about the status of his physical injuries, stating, "I still have some pain in my back, a little bit more pain in my, in my neck, a decreased range of movement, range of motion." Id.  However, Michaels asserted, "I don't think that that's really — that's not an issue here.  I don't think that my, my pain in my neck is stopping me from working." Id. Michaels explained that it was his vestibular problems, and not his back or neck pain, that was preventing him from working.  Id.  The ALJ inquired how Michaels' vestibular issues affected his ordinary life, and Michaels responded that he found it "a bit disorienting" when he was in "a room with people milling about" or when he was "looking for an item on the shelf [at a supermarket]." R. 81.  At the same time, however, Michaels acknowledged that "[w]alking down the streets — down the aisles of a supermarket, that's improved" and confirmed that he was still able to drive to the supermarket.  Id.  Michaels then testified that when was at home he regularly went out for walks, went to the gym, and performed walking exercises.  Id. Specifically, Michaels walked for "a mile at a time . . . about three times a week." Id.  Michaels testified that he had two children at home, a fifteen-year-old son and a thirteen-year-old daughter, both of whom he regularly helped with homework.  R. 82.  Michaels also had a dog that he regularly fed and occasionally took on walks.  R. 83.

17

Michaels testified that he was the financial secretary and on the Board of Directors of his synagogue. R. 82. These positions required him to attend two meetings every month, one board meeting and one executive committee meeting. Id. Additionally, Michaels had built a website for his synagogue. R. 83. The website took him six or seven months to create and on a weekly basis he spent about two hours adding to the website and keeping it up-to-date. R. 88. When asked if he attended weekly services at his synagogue, Michaels replied, "[l]ess often than I used to . . . if I'm in a room full of people that are walking around or even standing up and sitting down, I find that a bit disorienting [and] leaves me a little bit lightheaded." R. 83.

Michaels discussed his vestibular therapy sessions at Katonah Physical Therapy, explaining that the physical therapist made him do various exercises such as "turning [his] head to, from the left to the right, focusing on objects to the left and to the right, trying to make your brain realize that this is the way it is and to re-acclimate your system." R. 84. When asked if the vestibular therapy had helped him, Michaels responded, "I'm not sure if it's the therapy or the passage of time but, yes, it had — it, it has improved." Id.

After the ALJ finished questioning Michaels, Michaels' counsel David Kuznicki asked Michaels to clarify a few of his statements. First, he asked Michaels if he had any difficulties driving, to which Michaels answered, "[i]f I'm driving on local streets, making turns, narrow roads where, where there are buildings in the periphery, that's much more difficult than being, let's say . . . on a thruway." R. 85. Michaels estimated that he could only drive for 20 or 30 minutes at a time on local roads. Id.

Michaels answered questions about his sessions with Dr. Meiteles, testifying that he met with him every four to six months and that Dr. Meiteles had initially prescribed him medication to treat his vestibular issues but that they did not work so he stopped taking them. R. 86.

18

Michaels also described his tinnitus condition, explaining, "[i]t's a ringing in my ears.  It sounds like . . . it's coming from . . . inside of my head" and that it occurs "[c]onstantly; 7 days a week, 24 hours a day."  Id.  When questioned about how the tinnitus affected him, Michaels replied, "[i]t's a little distracting.  It's annoying, but other than that . . . it doesn't . . . I can hear you."  Id.  Michaels then described his frequent dizziness issues as "[i]t's a lightheadedness.  It's sort of like being, you feel like you're in a fog . . . or like you've been medicated."  Id.  When asked what brought on the "lightheadedness," Michaels responded that computer work and going to services at his synagogue often caused it.  R. 87.  Michaels also testified that "[a]t times" he suffered from nausea, especially when he had been through a long, exhausting day such as the day of his daughter's bat mitzvah.  Id.  He further explained, "fatigue is an earlier symptom before getting nauseous.  Generally, if I push, if I push on beyond the fatigue, then I'll get nauseous."  Id.  Michaels then testified about his functional limitations, claiming that he could only spend "[t]wo-and-a-half to three hours; not all at once" behind a computer in a day.  Id.  However, Michaels admitted that sitting was not a problem "per se" and that standing was not a problem as long as he could lean on something for stability.  R. 87-88.

> D.    The ALJ's July 16, 2009 Decision

On July 6, 2009, the ALJ issued a decision finding that Michaels was not disabled. R. 116-22.  To reach this conclusion, the ALJ engaged in the five-step sequential evaluation process prescribed by the regulations.  First, the ALJ found that Michaels had not engaged in substantial gainful activity from the alleged onset date of December 8, 2003, through the date last insured of December 31, 2007.  R. 118.  Next, the ALJ assessed the medical evidence in the administrative record to find that Michaels had vestibular dysfunction and a back disorder as severe impairments and tinnitus and bilateral high frequency sensorineural hearing loss as non-

severe impairments.  Id.  However, the ALJ assessed that none of Michaels' impairments, taken individually or together, "met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  R. 119.  From this, the ALJ found that Michaels retained the residual functional capacity "to perform a full range of light exertion level work" except that Michaels' "vestibular dysfunction prevented [him] from performing highly aerobic activities as well as activities requiring rapid side to side motions of the head [and from] working around dangerous machinery and at heights."  Id.  Finally, the ALJ concluded that Michaels was capable of performing past relevant work as a comptroller.  R. 121.

       E.       The Appeal's Council's Decision

On July 23, 2009, Michaels submitted to the Appeals Council a request for review of the ALJ's decision.  R. 173-74.  On January 20, 2011, the Appeals Council granted Michaels' request for review and remanded the case to an ALJ for further proceedings.  R. 129-30.  Specifically, the Appeal's Council found that the ALJ's decision did not adequately consider Dr. Meiteles' assessment that Michaels' "dizziness occurs daily and lasts for hours" and that Michaels' symptoms "interfere with [his] attention and concentration to perform even simple work tasks."  R. 129.  The Appeals Council charged the ALJ on remand to "[o]btain evidence from a medical expert, preferably a neurologist, to clarify the nature and severity of the [Michaels'] impairments," "[g]ive further consideration to [Michaels'] maximum residual functional capacity . . . and provide rationale with specific references to evidence of record in support of assessed limitations," and "obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the [Michaels'] occupational base."  R. 129-30.

       F.       The August 3, 2011 ALJ Hearing

After the Appeals Council remanded Michaels' case, another hearing was held before an

ALJ on August 3, 2011.  R. 32-73.  During this hearing, Michaels was again represented by

attorney David Kuznicki.  R. 34.

      1.    <u>Testimony of Dr. Gerald F. Winkler, M.D.</u>

Neurologist Gerald F. Winkler, M.D., testified as an expert regarding Michaels' medical

condition.  Dr. Winkler reviewed Michaels' medical record so that he would be able to evaluate

Michaels' medical condition in the relevant period, that is, December 8, 2003, through

December 31, 2007.  R. 37.  Dr. Winkler noted that when Michaels injured himself in the

staircase accident, he suffered a fracture "of the bones of the cervical spine" and "compression

fractures of a couple of thoracic vertebrae" but that these injuries had since recovered.  <u>Id.</u>  In Dr.

Winkler's view, "[t]he most important sequel of his fall has been an injury to the balance portion

of the middle ear, such that [Michaels] has been very sensitive, especially initially, to head

movement, which has been capable of . . . provoking some dizziness, vertigo and, earlier, nausea

and vomiting."  <u>Id.</u>  Dr. Winkler then testified, "[t]here's been some gradual improvement, but

[Michaels'] experiences now is generally, is sensation of dizziness and nausea."  <u>Id.</u>  However,

Dr. Winkler qualified this statement with the proviso that "these are aspects of the clinical

picture that are subjective and, therefore, we have to rely on the patient's description of them.

It's not something that we can judge objectively."  <u>Id.</u>

Dr. Winkler discussed Michaels' medical record.  R. 38.  On August 17, 2004, Michaels

was capable of driving his children to camp and sitting at the computer for a couple of hours.  <u>Id.</u>

At that point, Dr. Winkler explained, "[Michaels'] tolerance was . . . that he could work on his

checkbook and edit the Temple Times . . . he felt like shuffling paper made him busier and he

was looking forward to going to Lake George and riding a motorboat."  <u>Id.</u>  Dr. Winkler noted

that on March 27, 2006, Michaels reported that reading on a computer for an hour-and-a-half

21

made him feel nauseous and dizzy and that in January 2007 Michaels was complaining of chronic imbalance and nausea but had not vomited in the last four months.  Id.  Michaels had an audiogram exam "which only showed a drop off in the highest frequencies, well above the speech range."  R. 39.  In May 2007, Michaels complained of having "a bad episode of nausea of dizziness after scrolling on the computer for three hours."  Id.  From this, Dr. Winkler suggested that Michaels would be "better advised to click on the scroll bar and just jump from one page to the next, without that scrolling motion" because this would not cause "such a bothersome effect as with scrolling."  Id.  Dr. Winkler summed up the medical evidence, testifying, "in substance, we have an individual who has traumatically-induced impairment of the balance function of the inner ear and we think he's vulnerable to sensations of dizziness and nausea with certain visual input and with certain head movements."  Id.  From this, Dr. Winkler assessed, "[s]ince much of this is subjective in nature, I can only tell you that the nature of the complaints is entirely consistent with the known characteristics of the effects of head trauma on the balance working of the inner ear and that the limitations would include avoidance of unguarded heights or working near moving machinery or working in situations where the visual input would be similar to scrolling computers or moving rows of objects."  R. 39-40.  Thus, in Dr. Winkler's view, Michaels "would not be suitable to work on ramps or staging," but he would be able to "climb stairs while holding on to the handrail," drive, and "do activity which involved limited use of the computer such as looking up data from time-to-time without having to scroll."  R. 40.

When asked by the ALJ whether Michaels would "be able to sit through a typical eight-hour workday," Dr. Winkler responded, "Yes."  Id.  When asked how long Michaels would be able to stand or walk during an eight-hour workday, Dr. Winkler acknowledged, "[w]ell, he does go for walks, and so, that would suggest that he is able to walk, say, within the . . . context of an

office job." Id.  Dr. Winkler further testified that Michaels "could step over an obstacle in a

normal fashion" and "could walk on a narrow base in a normal fashion" but that "[h]e exhibited

imbalance with his eyes closed and that he was slow in walking backwards." R. 41.  From this,

Dr. Winkler concluded, "I would suggest that, in an occupational setting, the, the setting would

be a sedentary level of work." Id.  When asked by the ALJ for a specific amount of time that

Michaels could stand or walk, Dr. Winkler responded, "[i]f he were walking on a level surface

and not moving his head around, he would be okay and I wouldn't impose a, a time limit, except

that since that you do have to move your head around in order to see where you're going or

where you're going to go." Id.  When asked if Michaels had any limitations in "his ability to lift

or carry objects during the day," Dr. Winkler replied, "[t]hat would depend on whether he is

using any assistive device for balance . . . [b]ut there would be no, no demonstrated weakness

that would constitute a weight limitation other than normal." R. 42.  The ALJ asked whether,

based on the medical record, that Dr. Winkler believed there was any improvement in Michaels'

condition from 2003 to 2007.  R. 55.  Dr. Winkler assessed that, over the course of that time

period, there was "longer exposure to the computer than had been reported previously" but there

was "no clear indication of other improvements."  R. 56.

Michaels' counsel then asked Dr. Winkler what diagnosis he would assign to Michaels,

to which Dr. Winkler responded, "traumatic labrinthy[11] injury." R. 43.  Dr. Winkler was asked

to explain the symptoms of benign paroxysmal positional nystagmus, a condition Michaels had

previously been diagnosed with.  R. 43.  Dr. Winkler explained, "the movement of the head into

a certain position is what may stimulate the vertigo in this patient.  It would appear that, with the

---

[11] "Labrinthy" refers to the "internal or inner ear, composed of the semicircular ducts,
vestibule, and cochlea." Stedman at 957.

trauma, certain little pieces of calcium which are normally embedded in a gel adjacent to sensitive hairs in the inner ear get thrown loose and when the head is put in certain positions, they float around and create abnormal stimulation that is felt as vertigo." R. 46-47. When asked if tinnitus could interfere with a person's concentration and attention, Dr. Winkler testified, "tinnitus seems to bother people more when they are depressed. If they are engaged in interesting activity or concentrating on other things, the tinnitus is less bothersome." R. 49. Michaels' counsel asked Dr. Winkler if Michaels' condition could have caused him to be fatigued, to which Dr. Winkler responded, "I would say that for it to result in fatigue, it would have to be through an emotional side effect of the, of the symptom of vertigo and perceived limitations arising [therefrom]." R. 50. Michaels' counsel then pointed to a notation in Michaels' medical record from July 18, 2007, stating, "[h]e has increased dizziness at computer from looking between the keyboard and paper and screen," and asked whether such complaint "would be consistent with his condition." R. 54. Dr. Winkler replied that the complaint would be consistent. Id.

### 2. Testimony of Vocational Expert Darren K. Flomberg

Darren K. Flomberg, a vocational expert, took the stand to testify about the availability of jobs that Michaels could perform in the national economy. Flomberg stated that he had reviewed Michaels' work history and identified four past jobs: business analyst, team development lead position, project manager, and director of research. R. 57-58. From this, Flomberg assessed that "all of his work history has been sedentary and highly skilled." R. 58. Furthermore, Flomberg acknowledged that "[t]hese are all heavy computer use jobs . . . all these positions involve frequent, at least frequent computer use." R. 59. In Flomberg's opinion, such jobs would require "at least three" and possibly "even five hours" on the computer every day.

24

Id.  When asked by the ALJ whether the skills that Michaels had presumably developed while working in these positions would be transferable to other jobs, Flomberg replied that people with Michaels' experience are "leading teams, they're supervising people, computer skills, analytical skills.  But, again, these are skills that generally are used when working in front of a computer." R. 59-60.  When asked if Michaels would have gained non-computer general office skills, Flomberg replied, "there's some telephone skills . . . There have been maybe some record-keeping skills and some filing skills."  R. 60.  Next, the ALJ inquired whether there would be any jobs available in the national economy for a hypothetical person of Michaels' "age, education, and work experience" who "can sit for eight hours; stand for six hours, stand and walk for six hours; is able to lift 10 pounds frequently and 20 pounds occasionally; but cannot perform highly aerobic work or work requiring rapid side-to-side or up and down motions of the head; cannot work around moving machinery; [and] cannot work at heights."  R. 60.  Flomberg asked for a clarification about whether there would be any computer restrictions, to which the ALJ responded that the hypothetical person could not use a computer to the extent that it would require "[r]apid movements of the head, up and down or side-to-side."  R. 61.  Flomberg replied that, for a person with such restrictions, there would be jobs available in the national economy for "office and administrative support positions . . . such as receptionist, service representative, [and] telephone operator."  R. 62.  Flomberg explained, "[t]hose types of jobs are sedentary. They don't involve rapid movement of the head."  Id.  Flomberg then testified that according to the Dictionary of Occupational Titles ("DOT"), 843,619 people perform the work of a customer service representative in the national economy, 594,980 people perform the work of a receptionist in the national economy, and 9,127 people perform the job of telephone operator in the national economy.  R. 63-65.

25

Michaels' counsel then asked Flomberg to assume a hypothetical person with the same limitations as the person that the ALJ described but with additional limitations that "the individual suffers from dizziness on a daily basis that lasts for several hours at a time. . . that the dizziness is increased by looking up and down or turning the head from side-to-side [and] attacks of dizziness are followed by fatigue."  R. 65.  When asked whether such a person could perform the jobs that Flomberg had just listed, Flomberg replied, "I don't think they would be able to . . . I don't think they'd be able to do anything."  R. 66.

### 3.    Testimony of David Michaels

At the close of the hearing, the ALJ briefly questioned Michaels about his past relevant work.  The ALJ first asked Michaels if he had ever worked as a CPA, to which Michaels responded that he had not worked as a CPA because he did not have the required degree.  R. 68.  The ALJ then asked if Michaels had ever done accounting work, to which Michaels replied that he had done accounting work at some point over the course of the last 15 years.  R. 68-69.

### G.    The ALJ's September 15, 2011 Decision

On September 15, 2011, the ALJ issued a decision again finding that Michaels was not disabled.  R. 15-26.  The ALJ noted that Michaels' date last insured was December 31, 2007, and therefore, Michaels "must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits."  R. 16.  The ALJ then engaged in the five-step sequential evaluation process for determining an applicant's disability, as required by 20 C.F.R. § 404.1520(a).

First, the ALJ found that Michaels "did not engage in substantial gainful activity during the period from his alleged onset date of December 8, 2003 through his date last insured of December 31, 2007."  R. 18.  Second, the ALJ determined that during the relevant period

Michaels had the following severe impairments: "vestibular dysfunction resulting in dizziness, nausea and vomiting," "lingering back pain," and obesity.  R. 18.  Additionally, the ALJ found that although Michaels also had tinnitus and bilateral high frequency sensorineural hearing loss, these were only non-severe impairments because "they have not been shown by the claimant to significantly interfere with the claimant's ability to perform basic work activities."  R. 18-19.  Third, the ALJ concluded that none of these impairments or combination of impairments "met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)."  R. 19.

Fourth, the ALJ determined that Michaels had "the residual functional capacity to perform the full range of light exertion work as defined in 20 CFR 404.1567(b)" because Michaels "was able to sit, stand and walk for 8 hours (for each activity) during a typical 8 hour work day; and was able to lift/carry objects weighing 20 pounds."  Id.  However, the ALJ assessed that Michaels did have the following limitations: "He was not able to work at heights or around dangerous machinery; cannot perform highly aerobic activities; and cannot perform activities that require rapid motions of the head from side to side."  Id.  The ALJ then explained how he reached these findings.  In assessing Michaels' alleged symptoms, such as his dizziness and nausea, the ALJ stated that he would follow a two-step process in which he first "determined whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce the claimant's pain or other symptoms," and second "evaluate[d] the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning."  Id.  To make these determinations, the ALJ summarized the evidence in the administrative record including Michaels' hearing testimony, Michaels' statements about his daily lifestyle, the results of the

27

Basic Balance Test administered by Shelley Hirsch, treating medical records from Putnam Hospital Center, the results of the neurological exam performed by Dr. Ranade, the treating records from Dr. Peretz, the Katonah Physical Therapy records, treating records from primary care physician Dr. Legler, the hearing testimony of medical expert Dr. Winkler, and the treating physician records from Dr. Meiteles.  R. 20-24.  Based on this evidence, the ALJ found that Michaels' "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the overall treating medical record, his testimony and the opinions of Dr. Winkler."  R. 24.  Specifically, the ALJ assessed that Michaels' complaint that he had "dizziness [for] several hours a day" was "not confirmed by the medical record" because his "activities of daily living to which he testified are inconsistent with the level of asserted functional limitation."  Id.  The ALJ reasoned that the fact that Michaels testified that he was able to drive, take care of his young daughter, use a computer, act as a member of the Board of Directors for his synagogue, walk up to one mile at a time, routinely go the gym, care for his dog, help his children with their homework, and do housework "demonstrate[d] that he [had] a substantial ability for attention and concentration, which is not at all consistent with his self-report that he has difficulty with performing even simple work tasks."  R. 24-25.

Finally, having found that Michaels had the residual functional capacity to perform light work with certain limitations, the ALJ concluded that Michaels "was capable of performing past relevant work as a Comptroller."  R. 25.  The ALJ explained that this decision was based largely on the opinion of vocational expert Flomberg who testified that "working with a computer does not typically require rapid movements of the head, but that 3-5 hours of computer work a day is

typical for the jobs that the claimant previously performed." Id.  The ALJ further acknowledged

Flomberg's testimony that "there are many other office/administrative jobs which are contained

within the classification of the claimant's prior jobs and are generally classified as

'Office/Administrative' types of jobs [that] also do not require rapid head movements or require

anything more than limited head movements [and] are performed at the sedentary exertional

level."  R. 25-26.  They include: "(i) Receptionist . . . with approximately 590,000 jobs available

in the national economy; (ii) Customer Service Representative . . . with approximately 840,000

jobs available in the national economy; and (iii) Telephone Operator . . . with approximately

70,000 jobs available in the national economy."  R. 26.  Thus, the ALJ concluded, "[i]n

comparing [Michaels'] residual functional capacity with the physical and mental demands of

[his] previous work, the ALJ finds that [he] was able to perform it as actually and generally

performed in the national economy," and "[a]ccordingly, [Michaels] is 'not disabled.'"  Id.

## II.   APPLICABLE LAW

### A.   Scope of Judicial Review under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining

whether the [Commissioner's] conclusions were supported by substantial evidence in the record

and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013)

(citation and internal quotation marks omitted); accord Burgess v. Astrue, 537 F.3d 117, 127–28

(2d Cir. 2008); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social

Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

Substantial evidence is "'more than a mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402

U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));

accord Burgess, 537 F.3d at 127–28; Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006);

Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on

particular issues, the ALJ's factual findings must be given conclusive effect so long as they are

supported by substantial evidence."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citation

and internal quotation marks omitted).  Thus, "[i]f the reviewing court finds substantial evidence

to support the Commissioner's final decision, that decision must be upheld, even if substantial

evidence supporting the claimant's position also exists."  Johnson v. Astrue, 563 F. Supp. 2d

444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)).  The

Second Circuit has characterized the substantial evidence standard as "a very deferential

standard of review — even more so than the 'clearly erroneous' standard."  Brault v. Soc. Sec.

Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted).  "The substantial

evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a

reasonable factfinder would have to conclude otherwise."  Id. (emphasis in original) (citation and

some internal quotation marks omitted).  "The role of the reviewing court is therefore quite

limited and substantial deference is to be afforded the Commissioner's decision."  Johnson, 563

F. Supp. 2d at 454 (citations and internal quotation marks omitted).

> B.      Standard Governing Evaluations of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person

will be found to be disabled only if it is determined that his "impairments are of such severity

that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim.  See 20 C.F.R. § 404.1520(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process).  First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," id. § 404.1520(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities . . . ," id. § 404.1520(c).  Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the claimant must be found disabled regardless of his age, education, or work experience.  Id. § 404.1520(a)(4)(iii).  Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's residual functional capacity ("RFC") to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work."  Id. § 404.1520(a)(4)(iv).  If the claimant is able to do such work, he or

she is not disabled.  Id.  Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's residual functional capacity permits the claimant to do other work.  Id. § 404.1520(a)(4)(v).  If the claimant cannot perform other work, he or she will be deemed disabled.  Id.  The claimant bears the burden of proof on all steps except the final one — that is, proving that there is other work the claimant can perform.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

III.   DISCUSSION

While Michaels marshals a number of arguments challenging the ALJ's decision, they boil down to one claim: that the ALJ's finding that Michaels had the residual functional capacity to perform the full range of light work is not supported by substantial evidence in the record. Michaels points to many statements in the record that, in his view, establish that "[t]here can be no reasonable claim that [Michaels] retained the capacity for either light or sedentary work," Pl. Mem. at 27, and that "a careful review of the record establishes functional limitations that are completely inconsistent with the capacity to perform either light or sedentary work," id. at 28. Michaels further asserts that the ALJ has mischaracterized the record in order to reach his erroneous conclusions.  See id. at 31-34.

Michaels points to statements in the administrative record that, in his view, are inconsistent with the ALJ's assessment of Michaels' residual functional capacity.  First, Michaels argues that evidence suggesting that he regularly had to take one-hour or two-hour naps during the day and that he frequently became exhausted after exercising or doing household chores demonstrates that he did not have the necessary stamina to perform light or sedentary work.  See Pl. Mem. at 28-29.  For example, Michaels cites to a vestibular therapy record from January 2005 in which Michaels reported that he had to lay down for a two-hour nap after using

a snow blower for 45 minutes.  Pl. Mem. at 28 (citing R. 391).  Michaels also cites to a self-reported statement in his New York State Disability Claim Function Report that he regularly took naps from 11:00 am to 12:00 pm and sometimes took a nap at 4:00 pm.  See Pl. Mem. at 29 (citing R. 283).

Next, Michaels highlights evidence in the record suggesting that he regularly became dizzy after engaging in "simple activity."  See Pl. Mem. at 29.  Michaels cites, in addition to other self-reported events, entries in his vestibular therapy records and his dizziness inventory questionnaire in which he reported the following: becoming nauseous after shoe-shopping, R. 392; feeling dizzy after walking down the aisle of a supermarket, R. 395; and having to lie in bed after attending Yom Kippur services at his synagogue, R. 380.  Similarly, Michaels points to several statements in the administrative record "demonstrat[ing] that Mr. Michaels became physically 'deconditioned' because he lacked the ability to engage in physical activities."  See Pl. Mem. at 30-31.  Specifically, Michaels relies on vestibular therapist Larkin's initial evaluation form in which she described Michaels' strength and endurance as "deconditioned." Pl. Mem. at 30 (citing R. 367).  Michaels also cites to a medical record completed by his primary care physician Dr. Legler in July 2007 in which he assessed that Michaels was "not actively dieting, exercising or losing weight."  Id. (citing R. 487).  Michaels further argues that the fact that his exercise goals were "so incredibly minimal" establish that he "lacked the capacity for both light and sedentary work."  Id.  In support of this, Michaels cites to statements in his vestibular therapy records in which he complained of having disequilibrium after walking, R. 444; feeling dizzy and nauseous after only walking for 20 minutes, R. 381; and being able to exercise on the stepper for only two minutes at a time, R. 392.

Michaels also asserts that the ALJ either ignored or misconstrued much of the evidence

33

in the record showing that Michaels regularly complained of vestibular symptoms after using computers. Pl. Mem. at 31-34. He cites to many self-reported statements in the record including the following: in September 2004, he had to lie down for 30-40 minutes after using a computer for two hours, R. 394; in February 2005, he had headaches after several hours of reading or using the computer, R. 460; in May 2007, he had a bad case of nausea after scrolling on the computer for three hours, R. 376; in July 2007, he had increased dizziness from looking between the computer screen, keyboard, and his papers, R. 375. Thus, in Michaels' view, these statements and others "unquestionably demonstrate[ ] that he could not perform sustained computer work activity." Pl. Mem. at 34.

Michaels concludes that the objective medical evidence in the record "establishes that he lacks the capacity to perform the exertional demands of both light and sedentary work." Id. Michaels asserts that Dr. Meiteles' medical assessment report "confirms that Mr. Michaels' chronic imbalance results in daily episodes of lightheaded and nausea and results in diminished attention and concentration such that he frequently could not complete even simple tasks." See id. Furthermore, in Michaels' view, Dr. Winkler "conceded" at the hearing "that the record established that general computer use, not just scrolling, set off his vestibular symptoms" and that "[Michaels'] descriptions of his functional limitations were consistent with Mr. Michaels' vestibular disorder." See id.; see also Pl. Reply at 2.

Michaels argues that he has "presented overwhelmingly persuasive evidence that his chronic vestibular disorder caused daily functional limitations that leave him incapable of any sustained work activity." See Pl. Mem. at 36-37.

    A.    <u>ALJ's Finding that Michaels Had the RFC to Perform Light Work</u>

If the ALJ were required to credit all of Michaels' complaints as to the frequency and

severity of his symptoms, we would agree that Michaels did not have the residual functional

capacity ("RFC") to perform light or even sedentary work.  However, as previously discussed,

this Court's role is to determine whether the ALJ's finding as to Michaels' RFC is supported by

substantial evidence.  See, e.g., Gillespie v. Astrue, 2012 WL 3646820, at *11 (E.D.N.Y. Aug.

23, 2012) ("A finding as to RFC will be upheld on review when there is substantial evidence in

the record to support the requirements listed in the regulations.").  In assessing an applicant's

RFC, the ALJ must determine "the individual's maximum remaining ability to do sustained

work activities in an ordinary work setting on a regular and continuing basis, and the RFC

assessment must include a discussion of the individual's abilities on that basis."  Melville v.

Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (citation and internal quotation marks omitted).

      In the Second Circuit case Genier, 606 F.3d at 49, the court articulated how an ALJ is

required to assess an applicant's reports of pain and other limiting symptoms in determining the

applicant's RFC:

> When determining a claimant's RFC, the ALJ is required to take the claimant's
> reports of pain and other limitations into account, 20 C.F.R. § 416.929; see
> McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704–05 (2d
> Cir.1980), but is not required to accept the claimant's subjective complaints
> without question; he may exercise discretion in weighing the credibility of the
> claimant's testimony in light of the other evidence in the record. Marcus v.
> Califano, 615 F.2d 23, 27 (2d Cir.1979).
>
> The regulations provide a two-step process for evaluating a claimant's assertions
> of pain and other limitations. At the first step, the ALJ must decide whether the
> claimant suffers from a medically determinable impairment that could reasonably
> be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). That
> requirement stems from the fact that subjective assertions of pain alone cannot
> ground a finding of disability. 20 C.F.R. § 404.1529(a). If the claimant does
> suffer from such an impairment, at the second step, the ALJ must consider "the
> extent to which [the claimant's] symptoms can reasonably be accepted as
> consistent with the objective medical evidence and other evidence" of record. Id.
> The ALJ must consider "[s]tatements [the claimant] or others make about [his]
> impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any

> other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings." 20 C.F.R. § 404.1512(b)(3); <u>see also</u> 20 C.F.R. § 404.1529(a); S.S.R. 96–7p.

<u>Genier</u>, 606 F.3d at 49.

Upon review of the ALJ's decision, it is clear that the ALJ not only acknowledged this "two-step process," but also properly engaged in both steps in assessing Michaels' self-reported symptoms. Indeed, the ALJ explicitly stated, "[i]n making this finding [as to Michaels' RFC], the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529." R. 19.

First, the ALJ recognized that Michaels had reported symptoms of dizziness, R. 20; dysfunction of balance, <u>id.</u>; nausea, R. 22; and fatigue, <u>id.</u>, all of which Michaels alleged "frequently interfered with [his] attention/concentration," <u>id.</u> The ALJ considered the objective medical evidence in the record to determine whether Michaels "suffer[ed] from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." <u>See</u> <u>Genier</u>, 606 F.3d at 49. In finding that Michaels' "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," R. 24, the ALJ relied on the following medical evidence: Dr. Ranade's diagnosis of "posttraumatic vertigo," R. 21; the Basic Balance Function test results finding "horizontal bilateral Benign Paroxysmal Positional nystagmus," R. 22; the opinions contained in Dr. Meiteles' reports, R. 22-23; and Dr. Winkler's expert medical testimony that Michaels "had a problem with the balance function of the inner ear," R. 23.

Next, the ALJ properly examined "the extent to which [Michaels'] symptoms can

reasonably be accepted as consistent with the objective medical evidence and other evidence of record."  See Genier, 606 F.3d at 49 (internal quotation marks and citation omitted).  The ALJ found that Michaels' "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the overall treating medical record, his testimony and the opinions of Dr. Winkler."  R. 24.  In reaching this conclusion, the ALJ noted that Michaels' "activities of daily living to which he testified are inconsistent with the level of asserted functional limitation."  Id.  Specifically, Michaels' testimony that he was still capable of driving on an open road and taking care of his daughter "demonstrate[d] that he ha[d] a substantial ability for attention and concentration, which [was] not at all consistent with his self-report that he ha[d] difficulty with performing even simple work tasks."  Id.  Additionally, the ALJ noted that Michaels was "active in his synagogue [as] a member of the Board of Directors," "attend[ed] meetings approximately twice a month," "help[ed] his children with their homework," "[was] able to walk up to 1 mile at a time and routinely [went] to the gym," "[was] able to care for his German Shepherd dog," and "[could] do housework."  R. 24-25.  The ALJ also referenced Michaels' hearing testimony in which he admitted that he did not typically have problems sitting or standing.  R. 20; R. 87-88 (testifying that sitting was not a problem "per se" and that "[s]tanding is fine . . . as long as I can lean on something").

Next, the ALJ pointed out statements made by Michaels' treating physicians that were inconsistent with the alleged severity and frequency of Michaels' symptoms.  For example, the ALJ noted that Michaels' "treating physician [Dr. Legler] reported no limitation in the claimant's exertion abilities in any treating note," R. 21; that Dr. Ranade found that Michaels' condition was essentially normal except for "slight dizziness when he suddenly would bend his

head" and thus did not require pharmacological treatment, id.; and that Dr. Meiteles "assessed no

deficits in sitting, standing, walking or lifting," R. 22-23.

The ALJ also found that Michaels' complaints should not be credited to the extent that

they were inconsistent with the expert medical testimony of Dr. Winkler who "opined that

[Michaels] can sit for 8 hours and has no problems with standing/walking on a level surface."

R. 24.  Thus, in finding that Michaels' statements as to the severity and limiting effect of his

symptoms were not entirely credible, the ALJ considered the objective medical evidence as well

as other relevant evidence in the record as required by 20 C.F.R. § 404.1512(b).  Accordingly, to

the extent that Michaels has argued that the ALJ erred by not considering evidence in the record

regarding Michaels' reports of dizziness, nausea, or fatigue, we find that the ALJ provided

sufficient explanation for his decision not to fully credit such statements.

Notwithstanding this finding, we must still determine whether there was substantial

evidence in the record to support the ALJ's assessment that Michaels retained "the residual

functional capacity to perform the full range of light exertion work [because he] was able to sit,

stand and walk for 8 hours (for each activity) during a typical 8 hour work day; and was able to

lift/carry objects weighing 20 pounds."  R. 19.  The regulation's definition of "light work" states:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting
> or carrying of objects weighing up to 10 pounds. Even though the weight lifted
> may be very little, a job is in this category when it requires a good deal of walking
> or standing, or when it involves sitting most of the time with some pushing and
> pulling of arm or leg controls. To be considered capable of performing a full or
> wide range of light work, you must have the ability to do substantially all of these
> activities. If someone can do light work, we determine that he or she can also do
> sedentary work, unless there are additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b); accord Burgess, 537 F.3d at 126 (noting that the light work category

has "been interpreted to include work that requires standing or walking, off and on, for a total of

38

approximately 6 hours of an 8–hour workday") (internal quotation marks and citation omitted).[12]

In finding that Michaels possessed the RFC to perform light exertion work with certain limitations, the ALJ adopted Dr. Winkler's testimony that Michaels "can sit for 8 hours and has no problems with standing/walking on a level surface, but cannot move his head from side to side or up and down rapidly."  R. 24.  Michaels takes issue with the ALJ's reliance on Dr. Winkler's testimony, arguing that "[although] we cannot dispute his credentials as a neurologist or his status as a board certified neurologist . . . the hearing testimony reveals no effort by the ALJ to have Dr. Winkler established as a 'disability' expert."  Pl. Reply at 3.  Michael contends that expert medical advisors, such as Dr. Winkler, cannot testify as to an applicant's disability because such advisors have "no connection to the Social Security Administration and no training in the disability evaluation process."  Id.  While Michaels alleges that "Dr. Winkler's resume reveals no connection to the Social Security Administration," id., our review of Dr. Winkler's resume reveals that he has had a consultative appointment as a medical advisor for the Social Security Administration since 1982, R. 212.  Furthermore, as 20 C.F.R. § 404.1527(e)(2)(iii) makes clear, ALJs have the authority to "ask for and consider opinions from medical experts on the nature and severity of [the applicant's] impairment(s)."  Thus, the ALJ committed no error in considering and crediting Dr. Winkler's opinion.

Michaels further suggests that the ALJ mischaracterized Dr. Winkler's opinion and that, in fact, "[h]is testimony clearly does not support a light residual functional capacity assessment."

---

[12] A person with the RFC for sedentary work must be able to perform "work that involves lifting no more than 10 pounds at a time, sitting, and a certain amount of walking or standing, and occasionally lifting light objects," and the walking or standing required for sedentary work should "generally total no more than about 2 hours of an 8-hour workday."  Halloran, 362 F.3d at 31 n. 3 (internal quotation marks and citations omitted); 20 C.F.R. § 404.1567(a).

Pl. Reply. at 2.  Upon review of the hearing testimony, we find that Dr. Winkler's expert medical opinion sufficiently supports the ALJ's RFC finding.

While Dr. Winkler recommended that Michaels work in a "sedentary" occupation, R. 41, his overall assessment of Michaels' capabilities is consistent with an RFC for light work.  First, when questioned whether Michaels would "be able to sit through a typical eight-hour workday," Dr. Winkler responded, "Yes."  R. 41.  Next, when asked how long Michaels would be able to stand or walk during an eight-hour workday, Dr. Winkler commented, "[w]ell, he does go for walks, and so, that would suggest that he is able to walk, say, within the . . . context of an office job."  Id.  Additionally, Dr. Winkler explained that Michaels "could step over an obstacle in a normal fashion" and "could walk on a narrow base in a normal fashion" but that "[h]e exhibited imbalance with his eyes closed and that he was slow in walking backwards."  R. 41.  Dr. Winkler further testified, "[i]f he were walking on a level surface and not moving his head around, he would be okay and I wouldn't impose a, a time limit, except that since that you do have to move your head around in order to see where you're going or where you're going to go."  Id.  Furthermore, other than the possibility that Michaels would be carrying an assistive device for balance, Michaels had "no demonstrated weakness that would constitute a weight limitation other than normal."  R. 42.  Given that the ALJ acknowledged in his RFC assessment that Michaels "cannot perform highly aerobic activities . . . and cannot perform activities that require rapid motions of the head from side to side," R. 19, we find that the ALJ's conclusion that Michaels has the RFC to perform light exertion work is generally consistent with and supported by Dr. Winkler's expert medical testimony.

Additionally, the ALJ's RFC assessment is supported in many respects by the opinions of Michaels' treating physicians and the other objective medical evidence in the record.  For

example, Dr. Peretz's finding that Michaels had "essentially a healed fracture of the lamina" with regard to his spinal injury, see R. 657, and Dr. Elkowitz's finding that Michaels "made great strives [sic] in terms of improving his range of motion" with regard to his finger injury, see R. 658, suggest that Michaels' post-fall injuries had healed and thus did not constitute limitations on his ability to walk or to lift and carry items.  Furthermore, Dr. Ranade's findings that although Michaels had suffered from posttraumatic vertigo he did not require any pharmacological treatment is generally consistent with the ALJ's assessment.  R. 513-14.  While Michaels' vestibular therapist described Michaels' strength and endurance as "deconditioned," R. 367, such an assessment is not inconsistent with a finding that an applicant is not disabled, see, e.g., Jones v. Astrue, 623 F.3d 1155, 1161-62 (7th Cir. 2010) (where applicant's treating physician referred to applicant as "deconditioned" such an opinion was consistent with the ALJ's finding that applicant could perform sedentary work).  Finally, although Michaels suggests that Dr. Meiteles' opinion contradicts the ALJ's findings, arguing, "Dr. Meiteles observed in May 2007 that Mr. Michaels experienced frequent attacks of balance disturbance and that testing revealed disturbed vestibular function," Pl. Reply at 3, such "observations" appear to be based on Michaels' self-reported complaints and thus do not demonstrate Dr. Meiteles' medical opinion.  In fact, some of Dr. Meiteles' opinions provide support for the ALJ's assessment.  See R. 578 (acknowledging that Michaels' "symptoms have improved with vestibular therapy to a chronic imbalance with associated nausea" and that Michaels' "last bout of vomiting associated with the dizziness was approximately four months ago")

Morever, Michaels' admissions that on a regular basis he drove, took care of his daughter, used a computer, did work for his synagogue, went on one-mile walks, exercised at the gym, took care of his dog, and did housework, see generally R. 24-25, provide substantial

41

evidence to conclude that, despite his limitations, he maintained a relatively active lifestyle commensurate with a person capable of performing light work.  Michaels has attempted to downplay this point by citing to several analogous cases that, in his view, show how such evidence "fails to demonstrate sustained activity consistent with light or even sedentary work." Pl. Mem. at 36.  However, these cases all involved applicants who faced substantially greater limitations and were substantially less active than Michaels.  See Poole v. Railroad Retirement Bd., 905 F.2d 654, 664 (2d Cir. 1990) (where the record demonstrated that the applicant "can go up or down the stairs only once a day, cannot sit in a bathtub, and needs help from time to time tying his shoes or putting on his pants" the fact that the applicant "is mentally alert and does Bible study in his home or can use his personal computer at home does not mean that he can do sedentary work"); Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (finding that evidence that applicant read, watched television, listened to the radio, and operated a vehicle "when required" was not sufficient to show that applicant "engaged in any of these activities for sustained periods comparable to those required to hold a sedentary job"); Murdaugh v. Sec. of Health & Human Servs., 837 F.2d 99, 102 (2d Cir. 1988) (evidence that applicant "waters his landlady's garden, occasionally visits friends and is able to get on and off an examination table" was insufficient to counteract treating physician's opinion that applicant was disabled); Aubeuf v. Schweiker, 649 F.2d 107, 113 (2d Cir. 1981) (finding that evidence about the applicant's relatively active daily routine was not sufficient to rebut treating physicians' "acknowledgment that [the applicant] was suffering from a medically determinable impairment which caused him disabling pain"). Michaels' situation is distinguishable from these cases in that Michaels has an active lifestyle involving daily engagement in numerous activities requiring a substantial degree of physical and mental stamina.

Overall, given the evidence of Michaels' active lifestyle, together with the testimony of medical expert Dr. Winkler and the other generally consistent medical evidence, there was substantial evidence in the record to support the ALJ's finding that Michaels could perform light work.[13]

IV.   <u>CONCLUSION</u>

For the foregoing reasons, Michaels' motion for judgment on the pleadings (Docket # 10) should be denied, and the Commissioner's motion for judgment on the pleadings (Docket # 16) should be granted.

## **PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections.  <u>See also</u> Fed. R. Civ. P. 6(a), (b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Richard Sullivan, and to the undersigned, at 500 Pearl Street, New York, New York 10007.  Any request for an extension of time to file objections must be directed to Judge Sullivan.  If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.</u>, 596 F.3d 84, 92 (2d Cir. 2010).

---

[13]  Michaels argues that he was not able to perform his past relevant work as Comptroller due to limitations in computer use.  <u>See</u> Pl Mem. at 31-34.  It is not necessary to reach this issue, however, given our conclusion that Michaels had the RFC for light work.  Michaels does not argue that such a finding was insufficient for the ALJ to conclude that he was not disabled.

Dated: February 18, 2014
     New York, New York

                                 GABRIEL W. GORENSTEIN
                                 United States Magistrate Judge